EXHIBIT 2

Branch AS No. Mos 360

MAY 04, 20 2007

Columbus

2007 12050
Recorded in the Above
Mortgage Book & Page
06-15-2007 04:43:02 PM
Monica W. Banks
Oktibbeha County, MS

# DEED OF TRUST -- MISSISSIPPI -- JIM WALTER HOMES, INC.

Whereas, QUINCY SHERMAN & KIZZY SHERMAN, Husband & Wife
AKA Kizzy L Sherman
hereinafter called Grantor, being justly indebted to JIM WALTER HOMES, INC., a corporation organized and existing under the laws of the State of Florida and qualified to do business in the State of Mississippi, and having a place of business at 2209 Hwy 45 North, Columbus, MS, Mississippi, hereinafter called Beneficiary, in the sum of One Hundred Ninety-one Thousand Seven Hundred Ninety and Xx / 100 Dollars ($ 191,790.00) as evidenced by one certain promissory note of even date herewith made by the Grantor to the Beneficiary and payable in equal monthly installments of Five Hundred Thirty-two and 75 / 100 Dollars ($ 532.75) each, the first installment to become due and payable on the "Payment Commencement Date" as set forth in the Completion Notice to be mailed or delivered by Jim Walter Homes, Inc. upon "release" (as that term is defined in the Limited Warranty) of the House by Jim Walter Homes, Inc., and one installment to become due on the same day of each succeeding month until payment in full. If not sooner paid, the entire outstanding indebtedness shall be due and payable 360 months from the Payment Commencement Date or no later than 384 months from the date of this instrument.

WHEREAS, the Grantor is desirous of securing the payment of said indebtedness at the maturity thereof and renewals thereof in whole, or in part, and also any further and future advances to be made to the Grantor by the Beneficiary as well as any other indebtedness which may be due or become due to the Beneficiary by the Grantor in this Deed of Trust;

NOW, THEREFORE, in consideration of Five Dollars to him in hand paid by W. Stewart Robison, hereinafter called Trustee, together with any successor trustee, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor does hereby grant, bargain, sell, convey, assign and warrant unto W. Stewart Robison Trustee, for the benefit of the Beneficiary, all the real estate in the County of Oktibbeha, State of Mississippi, described as follows:

PLEASE SEE LEGAL DESCRIPTION ATTACHED.

TOGETHER WITH all and singular the ways, easements, riparian and other rights, and all tenements, hereditaments and appurtenances thereunto belonging or in anyway appertaining, and all buildings, structures and other improvements now on said land or that hereafter may be erected or placed thereon, and all fixtures attached thereto and all rents, income, issues and profits accruing and to accrue therefrom.

The Grantor hereby covenants with the Trustee that the Grantor is lawfully seized of the fee simple title to the above described property and has full power and authority to grant, bargain, sell and convey the same to the Trustee; that said property is free and discharged from all liens, encumbrances and claims of every kind, including taxes and assessments; that said Grantor will make such further assurances to perfect the fee simple title to said property in the Trustee as may be reasonably required.

It is understood and agreed that this conveyance is made subject to and that the parties hereto have agreed on and are bound by and will observe and fulfill the following covenants, stipulations and conditions as obligatory upon the respective parties:

First: In addition to the aforesaid indebtedness, any and all extensions or renewals of the same or any part thereof, and any and all further or future advances, loans and extensions of credit by the Beneficiary herein, or the holder or holders of the indebtedness above described, to the Grantor are intended to be secured and are secured by this instrument.

Second: The Grantor shall pay the indebtedness recited in and evidenced by said note and any extensions or renewals thereof, and all other indebtedness or liability however created or evidenced; pay all taxes, assessments, levies, liens and encumbrances of every kind and nature on said property and upon this Deed of Trust and note and the monies secured hereby promptly when due and before delinquency thereof; pay all costs and expenses incurred or paid by the Beneficiary in collecting the indebtedness hereby secured or in enforcing or protecting the rights and security of Beneficiary hereunder, including a reasonable attorney's fee if placed in the hands of an attorney, whether collected by

Q.S. KS
Initials

foreclosure or otherwise; keep all buildings and structures now or hereafter erected upon the said premises constantly insured in an amount equal to the lesser of the actual cash value of the House now or hereafter erected on said premises or the indebtedness secured by this Deed of Trust on said House against all loss or damage by fire, windstorm or tornado, and extended coverage, as may be required by the Beneficiary, and in a company or companies acceptable to said Beneficiary. All of said policies and renewals thereof shall contain standard mortgage clauses with or without full contribution as Beneficiary shall require, and in such form as shall be satisfactory to the Beneficiary by which any loss or damage under said policies shall be payable to Beneficiary as its interest may appear.

Third: The Grantor further covenants to keep said property and the buildings now located thereon or hereafter to be erected thereon in good repair and to permit, commit or suffer no waste, impairment or deterioration thereof, and to comply strictly with all laws and governmental regulations affecting said property or its operation.

Fourth: It is distinctly understood and agreed that a default for thirty days in the payment of any sums of money to be paid hereunder by the Grantor or in the performance of any of the agreements contained herein on the Grantor's part to be performed shall cause the entire indebtedness, after first deducting therefrom any unearned Finance Charges, to fall due and payable at the option of said Beneficiary, and shall fully empower the said Beneficiary to have the Trustee, or any successor in said trust herein, to execute his trust, and said Beneficiary shall not be required to declare such acceleration in writing or give notice of it.

Fifth: All monies expended by the Beneficiary for the making of any and all needed repairs and improvements, payment of taxes, assessments, liens, judgments and insurance premiums, and all necessary expenses incurred by said Beneficiary in connection therewith, including any expense incurred in defending the title of the Grantor to this real estate, where necessary for the protection of the said Beneficiary's interests or in defending this Deed of Trust as a valid first lien on the real estate described or intended to be described herein, where necessary, or in seeking to have the Deed of Trust reformed by judicial proceedings, where necessary because of mistake in this act, or in causing this Deed of Trust to be executed, shall constitute a part of the debt secured by this Deed of Trust, which amount shall bear interest from the date so advanced until paid at the rate of ten percent 10% per annum, and shall become immediately due and payable to the said Beneficiary. (The Grantor agrees to pay all necessary and usual charges incident to the consummation of this obligation, and likewise the usual and necessary costs incident to the cancellation upon the record or records of this Deed of Trust after the obligation has been repaid in full.)

Sixth: In case the Grantor shall abandon the property conveyed hereby or become insolvent, or apply to a bankruptcy court to be adjudicated a voluntary bankrupt, or proceedings be instituted to put Grantor in involuntary bankruptcy, or should any proceedings be taken against the Grantor, looking to the appointment of a receiver, assignee or Trustee, then, and in either or any such case, all rents becoming due and payable to the Beneficiary herein, to be applied on the indebtedness secured hereby, and the whole indebtedness hereby secured, may, at the option of the Beneficiary, be declared due and payable.

Seventh: If the property conveyed herein should be situated in two or more counties or in two judicial districts of the same county, then the Trustee shall have full power, in case the Trustee is directed to foreclose under this instrument, to select in which county or judicial district the sale of all of the above property shall be made, and the Trustee's selection shall be binding upon the Grantor and the Beneficiary and all persons claiming through or under them, whether by contract or by law. The Trustee shall have full power to conduct any sale hereunder through an agent duly appointed by the Trustee for that purpose, but said appointment of agent need not be recorded.

Eighth: The Grantors waive the provisions of Section 89-1-55 of the Mississippi Code of 1972, and laws amendatory thereof, if any, as far as said Section restricts the right of the Trustee to offer at sale more than one hundred sixty (160) acres at a time, and the Trustee may offer the property herein conveyed as a whole regardless of the manner in which it may be described. The Grantors also waive the provisions of Section 89-1-59 of the Mississippi Code of 1972.

Ninth: In case of the sale of the said property hereunder, the Beneficiary shall have the same right to purchase at such sale as if a stranger to this instrument.

However, this conveyance is in trust. Should the Grantor pay said indebtedness thereon at maturity, and any renewal thereof, and also all further and future advances to Grantors by the Beneficiary, as well as any other indebtedness due or which may become due the Beneficiary, by the Grantors, and comply with all the terms, agreements and conditions of this instrument, then this conveyance shall be void, otherwise, at the request of said Beneficiary, or any legal holder of said indebtedness, or any part thereof, the Trustee herein named, or any succeeding Trustee, shall sell said property, or a sufficiency thereof to satisfy the indebtedness of every kind, hereby secured then unpaid after advertising the time, place and terms at least once a week for three(3) consecutive weeks preceding the date of such sale in some newspaper published in the county in which the land is located or if no newspaper is printed in such county, then in a newspaper of general circulation therein, and by posting one notice of such sale at the courthouse where such sale is to be held.

The Trustee's authority to sell shall not be exhausted upon making one sale, but Trustee may make as many sales under this Deed of Trust as may be deemed advisable by the Trustee herein named, or any succeeding Trustee. Out of

QS | LS
Initials

2007 12052
Mortgage Book & Page

the proceeds arising from such sale or sales, the cost and expense of executing this Deed of Trust, including a ten percent (10%) Trustee's fee, which is hereby agreed to be a reasonable Trustee's fee, and a reasonable attorney's fee, shall first be paid, next the amount of said indebtedness secured thereby then remaining unpaid, including the indebtedness herein described, and any further advance or advances and any amount expended on said property by the Beneficiary or Beneficiary's assigns, under the terms of this Deed of Trust, and all interest and attorneys' fees, and lastly, any balance of said proceeds remaining shall be paid to the Grantor.

The Beneficiary, or any subsequent holder of said indebtedness, or any part thereof is hereby authorized to appoint another Trustee in place and stead of and as successor to the Trustee herein named, or his successor or successors; such power of appointment may be exercised as often as the Beneficiary or holder of said indebtedness may desire, and shall continue as long as any part of the indebtedness hereby secured remains unpaid and such appointee shall have the same authority, title and powers as the Trustee herein named, and his acts shall have all the validity of the acts of the original Trustee.

If all or any part of said property herein conveyed is sold, transferred or conveyed by the Grantor, without the prior written consent of said Beneficiary, its successors or assigns, then Beneficiary, its successors or assigns, may at its option, declare all sums secured hereby to be immediately due and payable without notice or demand.

Grantor authorizes and directs the Beneficiary to enter a marginal notation or, at Beneficiary's option, to record a separate document executed only by Beneficiary, providing record notice of the Payment Commencement Date and the final maturity date of all indebtedness secured by this Deed of Trust at any time after determination of the Payment Commencement Date by Beneficiary. Until a marginal notation is made or a separate instrument is filed, the Payment Commencement Date shall be deemed to be six months from the date of this Deed of Trust.

Tenth: The Grantor further covenants and agrees that in the event the Grantor should file a petition for relief under the Bankruptcy Code and seek to pay any amount which is past due under this Deed of Trust as of the date of the filing of the petition through a Chapter 11, 12 or 13 plan, or any other plan under applicable insolvency or receivership laws, the Grantor will pay the Beneficiary interest on the total amount past due at a rate of ten percent (10%) per annum. Interest will be calculated on the total amount past due as of the date of the filing of the bankruptcy petition, including principal and past due interest and late charges, if any, and interest at the aforesaid rate will continue to be due and payable for the entire time required to pay the total amount past due through the bankruptcy plan.

Eleventh: If an event of default as set forth in Paragraph Sixth and otherwise herein shall have accrued, Beneficiary may, in addition to and not in abrogation of any other rights contained herein, proceed by suit or suits in law or in equity or by any other appropriate proceeding or remedy to pursue any other remedy available to it, all as Beneficiary in its sole discretion shall elect. A failure on the part of the Beneficiary to exercise an option herein contained shall not constitute a waiver in the event of any subsequent default.

It is covenanted and agreed that the terms "Grantor" and "Beneficiary" and "Trustee" for convenience herein employed, and any pronouns used in connection therewith, shall be construed to include the plural as well as the singular number, and the masculine, feminine and neuter gender, whenever and wherever the context so admits or requires; and that all covenants and obligations of the respective parties hereto shall extend to and be obligatory upon their heirs, legal representatives, successors and assigns.

WITNESS the signature of the Grantor this 4 day of May, 2007.

QUINCY SHERMAN

KIZZY SHERMAN

AKA Kizzy L Sherman

2007 12053

## ACKNOWLEDGMENT

STATE OF MISSISSIPPI
COUNTY OF Lowndes

Personally appeared before me, the undersigned authority in and for the said county and state, on this 4 day of May, 2007 within my jurisdiction, the within named Quincy Sherman and Kizzy Sherman, who acknowledged that (he) (she) (they) executed the above and foregoing instrument. AKA Kizzy L. Sherman

Notary Public

My Commission Expires:

(Affix official seal, if applicable)

LESLIE HARPER, LOWNDES COUNTY MS NOTARY PUBLIC My Commission Expires May 6, 2007

Prepared By and After Recording Return To:
Jeanetta M. Brown, Esquire
c/o Jim Walter Homes, Inc.
Central Review Department
P.O. Box 31601
Tampa, Florida 33631-3601
(813) 871-4811

Indexing Instructions:
Quarter Section: NW1/4, SW1/4
Section: 21
Township: T19N
Range: 15E
County: Oktibbeha
or
Lot No.:
Subdivision:
Map/Plat:

2007 12054
Recorded in the Above
Mortgage Book & Page
06-15-2007 04:43:02 PM
Monica W. Banks
Oktibbeha County, MS

# Exhibit "1"

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 530.2 FEET TO AN IRON PIN AND THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE SOUTH 89 DEGREES 25 MINUTES WEST A DISTANCE OF 356.0 FEET TO A POINT ON AN EXISTING FENCE LINE; RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST AND ALONG SAID FENCE LINE A DISTANCE OF 124.6 FEET TO A POINT; RUN THENCE EAST A DISTANCE OF 353.8 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST A DISTANCE OF 121.0 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.0 ACRE, MORE OR LESS.

Also

SEWER EASEMENT

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 651.2 FEET TO THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE WEST A DISTANCE OF 353.8 FEET TO A POINT ON AN EXISTING FENCE LINE: RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST ALONG SAID FENCE LINE A DISTANCE OF 86.5 FEET TO AN IRON PIN; RUN THENCE SOUTH 87 DEGREES 55 MINUTES EAST A DISTANCE OF 352.5 FEET TO AN IRON PIN ON THE WEST RIGHT-OF-WAY OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST ALONG SAID RIGHT-OF-WAY A DISTANCE OF 73.6 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.65 ACRE, MORE OR LESS.

CHANCERY COURT OKTIBBEHA MISSISSIPPI

Oktibbeha County, MS
I certify this instrument was filed on
06-15-2007 04:43:02 PM
and recorded in Mortgage Book
2007 at pages 12050 - 12054
Monica W. Banks

**MISSISSIPPI** **JIM WALTER HOMES, INC.**
**FINANCING AGREEMENT**

THIS AGREEMENT made this 4 th day of MAY, 20 07
between QUINCY SHERMAN & KIZZY SHERMAN
hereinafter referred to as "Buyer",
whose address is 201 LYNN LANE PROPERTY 49, STARKVILLE, MS, 39759,
and JIM WALTER HOMES, INC., a Florida corporation, having its principal office at 4211 W. Boy Scout Boulevard, Tampa, Florida 33607 and its local place of business at 2209 Hwy 45 North, Columbus, MS, 39701 hereinafter referred to as "Seller."

WITNESSETH:

1. Description of Property. Seller agrees to build a house as set forth in that certain Construction Agreement, and including the plans and specifications and Exhibits "A, B, C and "D" according to the standards as set forth in the Limited Warranty (the "House"), all of which are incorporated herein by reference, on the property of Buyer, located at: WARREN LANE, STARKVILLE, MS
and having a legal description, as provided by Buyer, as follows:

PLEASE SEE LEGAL DESCRIPTION ATTACHED.

**FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT**

| **ANNUAL PERCENTAGE RATE** The cost of your credit at a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost you. | **AMOUNT FINANCED** The amount of credit provided to you or on your behalf. | **TOTAL OF PAYMENTS** The amount you will have paid after you have made all payments as scheduled (not including any down payment). | **TOTAL SALES PRICE** The total cost of your purchase on credit, including your down payment of $ 0.00 |
|---|---|---|---|---|
| 8.00 % | $ 119,185.00 | $ 72,605.00 | $ 191,790.00 | $ $ 191,790.00 |

Your payment schedule will be:

| NUMBER OF PAYMENTS | AMOUNT OF EACH PAYMENT | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 360 | 532.75 | monthly, beginning the 5th day of the month following the 45th day after release of the House to the Buyer. |

You may obtain property insurance from anyone you want that is acceptable to Seller. If you get insurance through Best Insurors, Inc. your annual premium is estimated to be $ 584.00 for the one year term of the policy.
**Security:** You are giving a security interest in real property together with all improvements now or hereafter placed on the property located at:
**Street address or Rural Route:** WARREN LANE City STARKVILLE State MS.
**Late Charge**: If a payment is late, you will be charged $5.00 or 4% of the unpaid portion of the installment in default, whichever is less.
**Prepayment:** If you pay off early, you will not have to pay a penalty and you will be entitled to a refund of part of the Finance Charge.
**Assumption:** This indebtedness cannot be assumed.
An itemization of the amount financed is provided below.
See the remainder of this contract and the documents signed in conjunction with it for any additional information about nonpayment, default, any required payment in full before the scheduled date, and prepayment refunds and penalties.

**Itemization of Amount Financed:**
Cash Price $ 72,605.00 Less Down Payment of $ 0.00 Amount Financed $ 72,605.00

2. Time Price; Payment. Buyer acknowledges that Buyer has been offered the opportunity to pay for the House in full immediately upon its completion, in which case Buyer would pay a cash price of $ 72,605.00. However, Buyer has made a down payment of $ 0.00 and has elected and agrees to purchase said House for a Time Price of $ $ 191,790.00, which includes a Finance Charge of $ 119,185.00 calculated at an Annual Percentage Rate of 8.00 % per annum. The Finance Charge begins to accrue thirty (30) days prior to the due date of the first scheduled installment.

MAY 18 2007

The due date of the first scheduled installment will be determined with reference to the date of Seller's completion or substantial completion of its construction obligations hereunder. Substantial completion occurs when Seller determines that it has performed its obligations as set forth in the contract, with the exception of those remaining items, if any, listed on the "Tender Acknowledgement/Completion Certificate"; any work to be done by Buyer can be performed without hindering Seller's performance of such remaining items; and such remaining items will not prevent Buyer from preparing the House for occupancy. Once Seller has completed or substantially completed its construction obligations hereunder, it will "release" (as that term is defined in the Limited Warranty) the House to Buyer and notify Buyer of said release by mailing or otherwise delivering to Buyer to or at the address designated by Buyer a completion notice (which will contain the Payment Commencement Date). The Payment Commencement Date will be on the 5th day of the month following the 45th day after said release of the House to Buyer. If two (2) or more persons are named herein as Buyer, each Buyer agrees that execution of the Tender Acknowledgment/Completion Certificate by either of them is sufficient to bind the other(s).

Note - Weather conditions existing at the time of construction may cause Seller to delay the painting of the exterior of the House for a period of time. Furthermore, a Buyer may elect to do interior work which must be completed prior to other items being installed by Seller. This could prevent Seller from completing items for an indefinite period of time until Buyer completes Buyer's own work. The failure of Seller to have completed these items shall have no bearing on Seller's ability to release the substantially completed House to Buyer prior to such completion, nor shall it relieve Buyer from Buyer's obligation set forth in this Financing Agreement and in the promissory note and/or deed of trust executed in conjunction herewith to commence Buyer's regular monthly payments.

3. Insurance. Seller requires Buyer to keep the House to be built under this contract insured against damage or loss from fire, lightning, windstorm or tornado, and extended coverage and such other coverage as Seller may reasonably require. Buyer must maintain the required insurance coverage from the date the House is released to Buyer by Seller until Buyer's obligations under this contract are fully discharged. IN CONNECTION WITH THE FOREGOING, BUYER ACKNOWLEDGES HAVING READ, UNDERSTOOD AND ACCEPTED THE INSURANCE DISCLOSURES SET FORTH IN EXHIBIT "C" ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE.

4. No Oral Representations; Arbitration. This instrument and the other instruments signed in connection with this transaction, including a Limited Warranty, contain the price and all the terms and conditions agreed upon by Buyer and Seller, and no statement, representation or promise not set forth in this contract, or any of the other said instruments, has been made to induce either party to enter into this transaction. IN CONNECTION WITH THE FOREGOING, BUYER ACKNOWLEDGES HAVING READ, UNDERSTOOD AND ACCEPTED THE ARBITRATION AGREEMENT SET FORTH IN EXHIBIT "D" ATTACHED HERETO AND INCORPORATED BY THIS REFERENCE.

5. Title to the Property. Buyer warrants that Buyer owns the property described herein free and clear of all liens and encumbrances. In the event a full or complete legal description of the land upon which the House is to be built is unknown or unavailable to the parties at the time of execution hereof, Buyer agrees that the full or complete description of said land may be subsequently obtained and inserted by Seller in this document and such other documents executed in conjunction with this transaction which require a legal description and any such completion or correction of the description shall be effective as of the execution hereof.

6. Security Interest in the Property. Buyer agrees to execute and deliver to Seller a promissory note evidencing the amount of indebtedness hereunder and to execute and deliver a deed of trust covering the real property described in Paragraph 1, together with all buildings (including the House to be built hereunder), structures and improvements now or hereafter located on said real property securing the payment of the indebtedness hereunder, all of the terms of which the promissory note and deed of trust are incorporated herein by reference. Said promissory note and deed of trust shall be on forms supplied by Seller. The deed of trust shall provide that the holder may (but shall not be obligated to do so) advance moneys that must be or should have been paid by Buyer in order to protect said property and the lien or security of the deed of trust, and Buyer agrees without demand to forthwith repay such money, which amount shall bear interest from the date so advanced until paid at the rate of ten percent (10%) per annum (but in no event shall the rate exceed the maximum rate permitted under Mississippi law), and shall be considered as so much additional indebtedness secured thereby; but no payment by the holder of any such moneys shall be deemed a waiver of the holder's right to declare the outstanding indebtedness under the deed of trust immediately due by reason of the default or violation of Buyer in any of Buyer's covenants thereunder.

7. Prepayment. Buyer may prepay in full all sums remaining unpaid under this contract at any time, and, upon prepayment, Buyer shall receive a credit for all unearned charges, including a credit for the unearned Finance Charge. Unless prohibited by applicable state law, such credit shall be computed pursuant to the Actuarial Method.

8. Late Fee. For each installment not paid in full within fifteen (15) days of its scheduled due date, Buyer will be charged $5.00 or four percent (4%) of the unpaid portion of the installment in default, whichever is greater, provided that only one late charge will be charged on any installment, regardless of the period during which it remains in default.

9. Insufficient Funds Charge. If any check tendered to Seller or its assigns by Buyer hereunder is not paid upon presentation or is dishonored by the bank or depository institution upon which it is drawn, Buyer agrees to pay Seller a bad check charge of Twenty Dollars ($20.00), or the actual charge made by the depository institution for the return of an unpaid or dishonored instrument, whichever is greater.

10. Cancellation. In the event an unsatisfactory report of Buyer's credit or any other information unsatisfactory to Seller is received prior to beginning the construction of the House, Seller, at its option, may within ten (10) days thereafter, cancel this agreement upon returning to Buyer any payments or deposits. All provisions of this contract are subject to approval by an authorized representative of Jim Walter Homes, Inc.

11. Indemnification; Location of House on Property. In the event the House is constructed in a manner or at a location so as to be not entirely located upon the above-described property or the above-described property is not wholly owned by Buyer, Buyer agrees (1) to indemnify Seller for and hold Seller harmless from any and all damages, losses, judgments, expenses, costs, attorneys' fees (which attorneys are to be selected at Seller's sole discretion) and litigation expenses arising from resolving or litigating the circumstances or issues resulting from the House being located partially or wholly upon the wrong property, the payment of all of which sums shall be secured by the House and all other property made the subject of Seller's liens; (2) that the above-described property and the liens of Seller shall also include and encompass any

property of Buyer, whether now owned or hereafter acquired, upon which the House is actually located together with such additional property as is reasonably necessary, including up to fifty (50) feet in any direction from the House, as well as reasonable ingress and egress thereto; and/or (3) that Seller may, at Buyer's expense, purchase property at an alternative location (Seller to make a good faith effort to select property as geographically proximate to the improper location as reasonable under the circumstances), move the House to said location, and attach the Seller's liens to the House and property at said alternative location (selected at Seller's sole discretion).

12. Assignment. Seller may assign its interest in this contract and this contract shall be binding upon and inure to the benefit of the assigns and successors of the Seller.

13. Assumption. Buyer's indebtedness hereunder may not be assumed by any subsequent purchaser of the House.

14. Attorneys' Fees. Buyer agrees to pay reasonable attorneys' fees after default and referral of this contract for collection to an attorney who is not a salaried employee of Seller.

15. Acceleration Upon Default. In the event Buyer fails to perform any obligation contained in this contract or the Construction Agreement, or in said promissory note or deed of trust, the Seller may, at Seller's option, declare all sums remaining unpaid hereunder immediately due and payable. In the event of such acceleration, Buyer shall receive a credit for any unearned Finance Charge. Unless prohibited by applicable state law, such credit shall be computed pursuant to the Actuarial Method. Any failure to exercise said option of acceleration shall not constitute a waiver of the right to exercise the same at any other time.

16. Enforceability. Should any provision of this Financing Agreement be deemed by a court of competent jurisdiction to be unenforceable, that determination will not affect the enforceability of the remaining provisions.

17. Force Majeure. Seller shall not be liable for any failure or delay in performance under this Agreement to the extent said failures or delays are proximately caused by causes beyond the Seller's reasonable control and occurring without Seller's fault or negligence, including, without limitation, (I) failure of suppliers, subcontractors, and carriers to substantially meet its performance obligations under this Agreement, and (II) acts of God, government restrictions, wars, insurrections and/or any other causes beyond the reasonable control of the party whose performance is affected, provided that, as a condition to the claim of nonliability, Seller shall give Buyer prompt written notice, with full details following the occurence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

18. Governing Law. This Financing Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi.

**NOTICE**

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE BUYER COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE BUYER SHALL NOT EXCEED AMOUNTS PAID BY THE BUYER HEREUNDER.**

NOTICE TO BUYER: DO NOT SIGN THIS BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES.

BUYER ACKNOWLEDGES THAT BUYER HAD THE ELECTION OF PURCHASING EITHER FOR CASH OR UPON A TIME PRICE BASIS AND HAS ELECTED TO PURCHASE ON THE TIME PRICE BASIS.

BUYER ACKNOWLEDGES THAT BUYER RECEIVED A COPY OF THIS AGREEMENT AND THAT BEFORE SIGNING THE SAME, THE CONTRACT CONTAINED THE ENTIRE TERMS AND ALL BLANK SPACES HAD BEEN FILLED IN PRIOR TO THE SIGNING OF THE SAME.

IN WITNESS WHEREOF, Buyer and Seller have executed this contract on the day and year first above written.

SELLER: JIM WALTER HOMES, INC.

BY: Kate Cipolla

BUYER(S):

_______________ (SEAL)
QUINCY SHERMAN

_______________ (SEAL)
KIZZY SHERMAN

# Exhibit "1"

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 530.2 FEET TO AN IRON PIN AND THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE SOUTH 89 DEGREES 25 MINUTES WEST A DISTANCE OF 356.0 FEET TO A POINT ON AN EXISTING FENCE LINE; RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST AND ALONG SAID FENCE LINE A DISTANCE OF 124.6 FEET TO A POINT; RUN THENCE EAST A DISTANCE OF 353.8 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST A DISTANCE OF 121.0 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.0 ACRE, MORE OR LESS.

Also

SEWER EASEMENT

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 651.2 FEET TO THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE WEST A DISTANCE OF 353.8 FEET TO A POINT ON AN EXISTING FENCE LINE; RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST ALONG SAID FENCE LINE A DISTANCE OF 86.5 FEET TO AN IRON PIN; RUN THENCE SOUTH 87 DEGREES 55 MINUTES EAST A DISTANCE OF 352.5 FEET TO AN IRON PIN ON THE WEST RIGHT-OF-WAY OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST ALONG SAID RIGHT-OF-WAY A DISTANCE OF 73.6 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.65 ACRE, MORE OR LESS.

**MISSISSIPPI**
**CONSTRUCTION AGREEMENT**

**JIM WALTER HOMES, INC.**
(with Limited Warranty)

THIS AGREEMENT made this 4 th day of MAY, 20 07
between QUINCY SHERMAN & KIZZY SHERMAN
hereinafter referred to as "Buyer,"
whose address is 201 LYNN LANE PROPERTY 49, STARKVILLEMS, 39759,
and JIM WALTER HOMES, INC., a Florida corporation, having its principal office at 4211 W. Boy Scout Boulevard, Tampa, Florida 33607 and its local place of business at 2209 Hwy 45 North, Columbus, MS, 39701
______, hereinafter referred to as "Seller".

WITNESSETH:

In consideration of the payment by Buyer to Seller of the sum $ 72,605.00, (hereinafter referred to as "Purchase Price"), payable as hereinafter set forth, Buyer and Seller hereby agree as follows:

1. Description of House. Seller agrees to build a house, according to the plans and specifications and Exhibits "A, B, and D", executed in conjunction herewith and furnished to Buyer prior to the execution of this contract, which are by reference made a part hereof as if fully rewritten herein, on the real property of Buyer located at: WARREN LANE, STARKVILLE, MS 39759, Oktibbeha County
and having a legal description, as provided by Buyer, as follows:

PLEASE SEE LEGAL DESCRIPTION ATTACHED.

2. Payment; Draw Schedule. Buyer shall pay the Purchase Price as follows [check one]:

______ (a) Payment pursuant to the attached Draw Schedule Acknowledgment from Buyer's own reserve of cash funds.

______ (b) Payment pursuant to the attached Loan Commitment Letter with Draw Schedule provided by Buyer's lending institution.

X (c) Payment pursuant to a Seller-financed installment sale, subject to Seller approving Buyer for an extension of credit and Buyer sigining all additional documents required by Seller. In the event Buyer is not approved for Seller-financing, this Agreement is null and void.

For payment options 2(a) and 2(b), when Seller determines that there has been substantial completion of its contract obligations hereunder, and thereby determines that the remaining portion of the Purchase Price is due from the Buyer, Seller shall so notify Buyer in writing of such determination and such amount shall become immediately due and payable. Substantial completion occurs when Seller determines that it has performed its obligations as set forth in the contract, with the exception of those remaining items, if any, listed on the "Tender Acknowledgment/Completion Certificate"; and any work to be done by Buyer can be performed without hindering Seller's performance of such remaining items; and such remaining items will not prevent Buyer from preparing the House for occupancy. If Buyer fails to make immediate payment, interest at the rate of ten percent (10%) per annum will begin accruing ten (10) days thereafter on any amount remaining outstanding until paid.

The Purchase Price does not contemplate any revisions or alterations to the basic home model selected by Buyer that may be necessary due to site conditions or local governmental ordinances. In the event that Seller determines that additional costs are required, the parties agree to re-execute a new Agreement or either party may declare this Agreement null and void upon notice to the other.

Under Seller's incremental building concept, it is possible for Buyer to select a combination of interior finishing options that Seller cannot complete until Buyer first completes certain other work or items that Buyer has agreed to complete or provide. In such event, when Seller has completed as much work as it can until Buyer completes Buyer's own work, Seller shall promptly notify Buyer of such fact. If within fourteen (14) days of such notification, Buyer completes that work necessary to allow Seller to then complete Seller's remaining construction obligations, the payment schedule selected above shall be followed. If, however, Buyer fails to complete Buyer's own such work within fourteen (14) days, the remaining unpaid portion of the Purchase Price shall be due and payable in full at the end of such fourteen (14) day period and will accrue interest at the rate of ten percent (10%) per annum until paid.

3. No Oral Representations; Joint and Several Liability; Effectiveness of Contract; Arbitration Agreement. This instrument and the other instruments executed in conjunction herewith set forth the price and all the terms, promises, agreements, conditions and understandings between Buyer and Seller relative to the construction and purchase of the House to be built hereunder, and there are no other promises, agreements, conditions or understandings either oral or written between them other than as set forth herein. If two (2) or more persons are named herein as Buyer, their obligations shall be joint and several. Before this contract will become effective, it must be approved by an authorized representative of Seller. IN CONNECTION WITH THE FOREGOING, BUYER ACKNOWLEDGES HAVING READ, UNDERSTOOD AND ACCEPTED THE ARBITRATION AGREEMENT SET FORTH IN EXHIBIT "D" ATTACHED HERETO AND INCORPORATED BY THIS REFERENCE.

MAY 18 2007

4. Completion Date. NO COMPLETION DATE HAS BEEN REPRESENTED OR IS A PART OF THIS CONTRACT.

5. Soil Testing. Seller assumes no responsibility or obligation for, and in fact disclaims any responsibility or obligation for any testing, study or knowledge with respect to whether Buyer's site is suitable or proper for the construction of the House. Buyer hereby expressly warrants to Seller that Buyer has made and performed any and all reasonable or necessary testing, study, and investigation, or that Buyer has knowingly elected to forego any such testing, study and investigation and that Buyer's site is in fact, or deemed by Buyer to be, suitable and proper for the construction of the House to be built by Seller. Buyer acknowledges, understands and agrees that, in agreeing to build the House on the site selected by Buyer, Seller is relying upon Buyer's representation and warranty that the site is in fact suitable and proper for the construction of the House, including but not limited to the suitability and propriety of the foundation option selected by Buyer.

6. Footings and Foundation. Seller will be responsible for constructing any concrete footings for walls and piers as described in the Exhibit "B" incorporated herein. Any additional labor and/or materials required by reason of deficiencies in soil conditions not known to Seller until after excavation is completed, which would require extra footings, reinforcing, piers, concrete block or concrete walls, will be paid for by Buyer in addition to the Purchase Price.

7. Pilings. Unless pilings are specified for this House, either in the plans attached hereto or in Exhibit "A" attached hereto, they are not a part of this contract, will not be provided by Seller and are not included in the price contained in this contract. Unless otherwise required by locally-adopted code, regulation or the like, or unless otherwise agreed in writing by the parties hereto, if pilings are so specified, they shall be set into the ground. The depth into the ground they are to be set will be determined by any relevant, locally-adopted code; if there is no such code, they will be set to the depth established by Seller. In the event Buyer requires that they be set to a depth greater than that determined by code or by Seller, as the case may be, this contract and all related documents, at Seller's option, may be cancelled and rendered null and void, with any down payment, less expenses actually incurred by Seller, being returned to Buyer. Commencement of construction shall not be deemed a waiver of Seller's right to cancel pursuant to this paragraph.

Unless otherwise specified in writing in this contract and/or the documents relating to it, Seller will install the specified pilings so that the maximum height of the building from the grade as measured from the bottom of the floor joists to the ground surface shall be eight (8) feet. The height of the remainder of the building from the grade is dependent upon the contour, slope or elevation of the ground at the point of installation of each remaining piling and unlevel sites may significantly reduce this eight (8) foot maximum clearance.

8. Site Preparation; Locating the House on Lot. Buyer is responsible for ensuring the suitability of and preparing the building site for construction. Such preparation includes, but is not limited to, grading and removal of trees, bushes, shrubs, debris and other such material. Buyer is responsible for precisely locating and situating by use of stakes the desired and proper location and position of the House on the building site and in the event Buyer fails to promptly do so, Seller is entitled to do so on Buyer's behalf; however, Seller's doing so shall not relieve Buyer's responsibility for staking the desired and proper location and situation of the House and in the event Seller does so, it shall be conclusively presumed that the location and position of the House are as instructed and desired by Buyer. Buyer is responsible for all clean-up work to the House and the property after Seller has performed its obligations hereunder.

9. Buyer's Responsibilities. Unless the Buyer has opted on Exhibit "A" for a turnkey stage of completion, this contract between Buyer and Seller is for the construction and sale of a partially-completed House. Seller is required to provide or perform only those items, duties and obligations specifically set forth herein. Any items or work necessary or desirable beyond or in addition to those specifically set forth herein shall be the responsibility of the Buyer. Some such items may include, but are not limited to, the availability, permitting, and installation of a septic system, water, electricity, gas, telephone and other utilities. Buyer is also responsible for obtaining the final Certificate of Occupancy, or its equivalent, for the House unless Buyer has opted for the turnkey stage of completion.

10. Limited Warranty. In conjunction with and as a part of the transaction evidenced by this Construction Agreement, Seller is extending to Buyer a Limited Warranty setting forth the standards pursuant to which the House will be constructed and agreeing to remedy certain items should they become defective during the applicable warranty period. The Limited Warranty is a part of the transaction whereby Buyer has contracted with Seller to construct and sell the House; however, with respect to all matters addressed therein, the Limited Warranty supersedes and controls all other contract documents, discussions and representations. Neither any of the contract documents nor any discussions or representations can change, modify or override the Limited Warranty. The Limited Warranty cannot be changed or altered in any way and neither Buyer nor Seller's agents or employees have any authority to do so.

11. DISCLAIMER OF ALL OTHER WARRANTIES. TO THE EXTENT SELLER CAN LAWFULLY DO SO, SELLER DISCLAIMS ENTIRELY ANY AND ALL WARRANTIES INCLUDING WARRANTIES OF SUITABILITY AND HABITABILITY. SELLER MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, BEYOND THE EXPRESS TERMS AND PROVISIONS OF SAID LIMITED WARRANTY.

12. Indemnification. Buyer hereby indemnifies Seller for any action(s) taken by Seller in reliance upon the statements made by Buyer herein or directions and instructions given by Buyer to Seller in performing the work contemplated hereunder.

13. Cancellation of Contract. In the event Buyer fails to perform any activities or duties required of Buyer (e.g., failure of Buyer to prepare site for construction or, where applicable, failure of Buyer to complete construction of Buyer'sown foundation, failure to obtain financing from third-party lender or fails to provide land suitable for building, failure to clear up all title or contract issues), which failure prevents Seller from commencing construction for a period of sixty (60) days from the date hereof, Seller, at its option, may cancel this contract and retain or recover from Buyer the costs incurred up to the date notice of such cancellation is given to Buyer. In the event the contract is cancelled for any other reason, Seller retains the right to recover from Buyer the Seller's cost incurred such as the costs of survey, permitting, title search, perk test, recording fees and Seller's lost profits incurred up to the date of cancellation. Thereafter, neither Buyer nor Seller shall have any further claim against the other.

14. Buyer Prohibited From Performing Work On House Until House Released By Seller; Exceptions. Until such time as Seller "releases" the House to Buyer, as set forth in the Limited Warranty, Buyer shall not be permitted to perform any labor in or add any materials to the interior of the House which could in any way hinder Seller's ability to finish its contract obligations hereunder. However, Seller will permit Buyer to "rough in" duct work and to prewire for telephones and television antennas during the course of Seller's performance and before the "release" of the House to Buyer. Until such time as the "release" of the House to Buyer occurs, as set forth in the Limited Warranty, Seller is entitled to, and Buyer hereby grants Seller, full and unrestricted ingress and egress to and use of the above-described property to do and perform all acts, works and construction Seller deems reasonable and necessary to perform or fulfill Seller's activities and obligations hereunder in such manner and at such time as Seller elects.

15. Liens. Failure of this Seller or Subcontractors or Suppliers to pay those persons supplying material or services to complete this contract can result in the filing of a lien on the above-described property which is the subject of this contract. Subcontractors may be retained on Seller's behalf for labor services on the House. Any agreement between Buyer and Subcontractor shall be separate and apart from this contract, and any responsibility for payment associated therewith shall be the sole responsibility of Buyer.

16. Attorneys' Fees. Buyer shall pay Seller's reasonable legal costs and attorneys' fees incurred in successfully enforcing this contract against Buyer.

17. Enforceability of Contract Provisions. Should any provision of this Agreement be deemed by a court of competent jurisdiction to be unenforceable, that determination will not affect the enforceability of the remaining provisions.

18. Governing Law. This Construction Agreement with Limited Warranty shall be governed by and construed in accordance with the laws of the State of Mississippi.

19. Force Majeure. Seller shall not be liable for any failure or delay in performance under this Agreement to the extent said failures or delays are proximately caused by causes beyond the Seller's reasonable control and occurring without Seller's fault or negligence, including, without limitation, (I) failure of suppliers, subcontractors, and carriers to substantially meet its performance obligations under this Agreement, and (II) acts of God, government restrictions, wars, insurrections and/or any other causes beyond the reasonable control of the party whose performance is affected, provided that, as a condition to the claim of nonliability, Seller shall give Buyer prompt written notice, with full details following the occurence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

20. Contract Execution. Should more than one Buyer execute this contract, each Buyer agrees that execution of the Tender Acknowledgment/Completion Certificate by either of them is sufficient to bind the other. When signed by Buyer, this Agreement becomes an offer to purchase, and upon signature by Seller, becomes a legally binding contract.

IN WITNESS WHEREOF, Buyer and Seller have executed this Construction Agreement on the day and year first above.

SELLER: JIM WALTER HOMES, INC.

BY: [signature] Kate Cipolla

BUYER(S):

[signature] (SEAL)
QUINCY SHERMAN

[signature] (SEAL)
KIZZY SHERMAN

**BUYER'S RIGHT TO CANCEL**

**YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

Internal Use Only
Reviewed by: [signature]
Date: 5-7-07

# Exhibit "1"

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 530.2 FEET TO AN IRON PIN AND THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE SOUTH 89 DEGREES 25 MINUTES WEST A DISTANCE OF 356.0 FEET TO A POINT ON AN EXISTING FENCE LINE; RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST AND ALONG SAID FENCE LINE A DISTANCE OF 124.6 FEET TO A POINT; RUN THENCE EAST A DISTANCE OF 353.8 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST A DISTANCE OF 121.0 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.0 ACRE, MORE OR LESS.

Also

SEWER EASEMENT

A TRACT OF LAND BEING LOCATED IN THE NORTHWEST QUARTER (NW ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 21, TOWNSHIP 19 NORTH, RANGE 15 EAST, OKTIBBEHA COUNTY, MISSISSIPPI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF THE NORTH HALF (N ½) OF THE SOUTHWEST QUARTER (SW ¼) OF SAID SECTION 21 AND THE EAST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS 16TH SECTION ROAD; RUN THENCE NORTH 01 DEGREE 23 MINUTES EAST AND ALONG SAID EAST RIGHT-OF-WAY A DISTANCE OF 395.3 FEET TO A FENCE CORNER POST ON THE SOUTH RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS LINDSEY LANE; RUN THENCE SOUTH 89 DEGREES 09 MINUTES EAST A DISTANCE OF 674.6 FEET TO A POINT ON THE WEST RIGHT-OF-WAY OF A COUNTY ROAD KNOWN AS WARREN ROAD; RUN THENCE NORTH 00 DEGREES 17 MINUTES EAST A DISTANCE OF 651.2 FEET TO THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT; RUN THENCE WEST A DISTANCE OF 353.8 FEET TO A POINT ON AN EXISTING FENCE LINE; RUN THENCE NORTH 01 DEGREES 16 MINUTES EAST ALONG SAID FENCE LINE A DISTANCE OF 86.5 FEET TO AN IRON PIN; RUN THENCE SOUTH 87 DEGREES 55 MINUTES EAST A DISTANCE OF 352.5 FEET TO AN IRON PIN ON THE WEST RIGHT-OF-WAY OF SAID WARREN ROAD; RUN THENCE SOUTH 00 DEGREE 17 MINUTES WEST ALONG SAID RIGHT-OF-WAY A DISTANCE OF 73.6 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.65 ACRE, MORE OR LESS.

# EXHIBIT "A"

**Jim Walter HOMES**

## PACKAGE, OPTION, AND ADDITIONS

Executed in conjunction with that certain Agreement to build a House entered into between Jim Walter Homes, Inc., ("Seller") and the undersigned Buyer (whether one or more, hereafter "Buyer"), of even date herewith. The following package, option and additions are made a part of said Agreement as if fully recited therein:

Package, Option and Additions: JW_ARLINGTON

| Description | Quantity |
|---|---|
| Finish Model | 1 |
| Electrical Heat Pump and Air | 1 |
| Elec Circuit - Septic | 1 |
| Elec Temp Pole or Generator | 1 |
| Code: Site Perk Test | 1 |
| Appliance Pkge A | 1 |

**The above Package, Option and Additions** have been selected, approved and purchased by the Buyer.

Any items, supplies and materials delivered to Buyer and not to be installed or incorporated into the House by the Seller shall become the responsibility of the Buyer upon delivery thereof and Seller shall be thereafter fully and completely relieved of and from any liability or obligation for the loss, damage, injury, maintenance, safe keeping or responsibility whatsoever thereto, unless caused by the act or omission of Seller.

The Specifications and Data Rider attached to this Agreement and identified as Exhibit "B", contains the description and specifications of certain items, commodities, materials and services used, delivered or performed by Seller (also referred to as Builder in Exhibit B) or incorporated into the House to be constructed by Seller and, where applicable, the content and substance of those package, option and additions listed above, or otherwise selected, approved and purchased by the Buyer, are limited and defined thereunder, and all parties to this Agreement shall be bound and governed by the terms and limitations thereof.

Jim Walter - Columbus
**BRANCH**

05/04/2007
**DATED**

QUINCY SHERMAN **(BUYER)**

KIZZY SHERMAN **(BUYER)**

**(SELLER)**

**THE CLASSIC SERIES**
**EXHIBIT "B"**
**SPECIFICATIONS AND DATA RIDER**
**AUGUST 2004**

**JOB NAME:** Sherman **BRANCH:** Columbus, MS 74

In instances where brand names and/or standards are specified, Jim Walter Homes, Inc. ("Seller" or "Builder") may substitute (without notice) materials of equal or better quality.

Removal of construction debris and post construction clean-up is to be provided by the Buyer unless the home is built to Turnkey Stage of completion. Subcontractors are to place their waste materials in piles at the construction site.

Arrangements for temporary electrical service during construction is the responsibility of the Buyer.

Tap fees and hookups to water source, sewer system, gas supply, phone, or cable television companies are not included in your contract unless specifically noted.

Impact fees are not a part of your contract.

Due to Buyer's participation in the building process, it is very important that Buyer become familiar with the permitting requirements, if applicable, in the area where Buyer's House will be constructed. Builder encourages Buyer to contact the local building department, health department, water management department, and environmental protection department. Please be advised that:

- As required by local customs, practice or ordinance, Builder will either obtain the required building permit(s), or assist the home buyer to do so, for all work contained in the contract between Buyer and Builder.

- It is the Buyer's responsibility to obtain, if necessary, all health, water management, environmental or any other kind of permit(s) required by local custom, practice or ordinance in the area where the House will be built.

- Builder accepts no responsibility for any building permit(s) for work not specified in the contract with Builder, or for any other kind of permit(s).

- Builder will request inspections, when appropriate, of the work done by Builder under the contract with Builder.

- It is Buyer's responsibility to request the additional inspections as required by the building department for work done beyond that included in Buyer's contract with Builder.

- Unless and until all permits have been properly issued and all necessary inspections have been completed, the building department will not allow occupancy of the House. Therefore, it is very important that Buyer comply with the obligations as stated in this notice.

[signature] 5-4-07
Buyer's Signature Date

[signature] 5-4-07
Buyer's Signature Date

MAY 18 2007

**Jim Walter Homes, Inc. EXHIBIT "C"- Mississippi**

NEW CONSTRUCTION INSURANCE DISCLOSURE STATEMENT

Each of the undersigned (who, whether one or more, is called the Buyer in the contract to which this Insurance Disclosure Statement is attached as an Exhibit (the "Contract")) hereby certifies to Jim Walter Homes, Inc. ("Seller") that I understand and acknowledge the following:

Seller requires Buyer to keep the House to be built under this Contract insured against damage or loss from fire, lightning, windstorm or tornado, and extended coverage ("Fire and Extended Coverage") and such other coverage as Seller may reasonably require. Buyer must maintain the required insurance coverage from the date the House is released (as that term is defined in the Limited Warranty) to Buyer by Seller until Buyer's obligations under this contract are fully discharged.

Buyer may choose the agency or company through which any required insurance is to be obtained, so long as the agency or company is authorized to do business in Mississippi. Buyer has the option of providing the required insurance through an existing policy or a policy independently obtained and paid for by the Buyer, or applying for insurance coverage through Best Insurors, Inc.

THE REQUIRED INSURANCE COVERAGE MUST INSURE THE HOUSE TO THE EXTENT OF THE LESSER OF THE ACTUAL CASH VALUE OF THE HOUSE OR THE INDEBTEDNESS SECURED BY THE DEED OF TRUST.

IF FIRE AND EXTENDED COVERAGE IN THE AMOUNT OF THE CASH PRICE OF THE HOUSE IS OBTAINED THROUGH BEST INSURORS, INC. THE INITIAL ANNUAL PREMIUM IS ESTIMATED TO BE BETWEEN $ 584.00 AND $ 584.00 FOR THE ONE-YEAR TERM OF THE POLICY. SELLER IS UNABLE TO PROVIDE THE EXACT AMOUNT OF THE PREMIUM AT THIS TIME BECAUSE IT IS BASED ON UNIFORM RATING FACTORS WHICH ARE NOT CURRENTLY KNOWN TO US BUT WHICH ARE USED BY BEST INSURORS, INC. IN MISSISSIPPI IN CALCULATING THE AMOUNT OF THE PREMIUM TO BE CHARGED. Seller is unable to advise Buyer of the premium if the required insurance is not obtained through Best Insurors, Inc.

The required policies shall contain a clause making the proceeds payable to the Seller, or its assigns, to the extent of its interest in the insured property. Seller reserves the right to refuse to accept an insurer offered by Buyer if the policy is not in the form or amount acceptable to Seller.

In the event Buyer fails to furnish an acceptable policy of insurance, premiums prepaid, or in the event Buyer fails to keep in effect the required insurance coverage, Seller shall have the right, but not the obligation, to purchase such coverage for Buyer, through or from any agency or company selected by Seller, and either add the premiums to the outstanding indebtedness or demand reimbursement, immediately or at any time thereafter from Buyer for those costs. All such advancements shall bear interest from the making thereof at the rate and under the terms and conditions set forth in the mortgage executed herewith. Seller's right to purchase such insurance coverage shall continue until Buyer delivers or causes to be delivered to Seller, or its assigns, at P.O. Box 31601, Tampa, Florida 33631-3601 an insurance policy or policies providing the required insurance coverage together with satisfactory evidence of payment therefor, or until Buyer's indebtedness is fully discharged, whichever occurs first. Seller's exercise of this right with respect to any particular policy year or succession or combination of policy years shall not be deemed or considered a waiver by Seller of Buyer's continuing obligation to provide Buyer's own such coverage and Seller shall not, by exercising this right become thereafter obligated to notify Buyer of Seller's future election not to purchase further such coverage on Buyer's behalf.

Buyer must make all insurance premium payments, whether for insurance purchased through Best Insurors, Inc., or from another company, directly to the agency or company from which the insurance is obtained. NO PREMIUMS FOR INSURANCE ARE INCLUDED IN THIS CONTRACT NOR ARE ANY PREMIUMS PAID FOR THROUGH BUYER'S DOWN PAYMENT.

INITIAL THE BOX(ES) APPLICABLE TO THE ELECTION YOU MAKE:

[ OS | YS ] The undersigned Buyer elects to obtain the insurance through Best Insurors, Inc.

[   |   ] The undersigned Buyer elects to furnish the required insurance through an insurance company other than Best Insurors, Inc.

Furthermore, Buyer certifies to Seller that I understand and acknowledge the following:

- That the Contract to have Seller build a House for me and the mortgage (hereafter the "Security Instrument") I am signing with the Contract requires me to maintain continuous insurance coverage against damage or loss to my House from fire, lightning, windstorm and extended coverage in an amount at least sufficient to protect Seller's financial interest in my House until such time as I have fully paid Seller for my House.
- That Seller may require me to participate in Seller's escrow account program where I will make monthly payments into an escrow account including a pro rata portion of my insurance premium, to be disbursed by Seller, to pay for an insurance policy of my choosing so long as the policy meets Seller's insurance requirements.
- That I must provide proof of the required insurance coverage to Seller from the date the House is released to me/us by Seller and that all renewal policies thereafter must be provided to Seller thirty (30) days prior to the expiration of the current policy. If I participate in the escrow program, I am required to designate where my escrow funds should be paid to purchase the required insurance policy when requested by my mortgage servicer.
- That if I fail to provide such insurance coverage or designate such payment, I will be in default of my obligations under the Contract, which could subject me, at the option of Seller, to the remedies for breach of contract.

OS YS
Initials

MAY 18 2007

**Jim Walter Homes, Inc. EXHIBIT "C"- Mississippi**

- That the insurance coverage required under my Contract and Security Instrument is limited to a Fire and Extended Coverage policy. This type of policy will only insure against damage done to my House itself as a result of an insurable event. It does not include protection for damage to the contents of my House or for any liability I may have as a homeowner for personal injuries to other people, both of which are coverages provided by a "Homeowners" policy.

- That Best Insurors, Inc. ("Best") offers, as disclosed in the Contract, insurance coverage that meets the requirements under the Contract and Security Instrument. Best is a Florida corporation affiliated with Seller by common ownership. Best has an established relationship with a licensed insurance agent domiciled in my state.

- That I have the right to obtain insurance coverage beyond the insurance required by the Contract and the Security Instrument; that it will be in my best interest to contact an insurance agent, broker or advisor about the amount and type of policy that would be appropriate for my insurance needs; that I may contact any agent, broker or company I wish in order to obtain the insurance coverage I want at the most competitive price; that I may choose the agency, broker or company through which the required insurance is obtained, provided the agency, broker or company is authorized to do business in my state; and that I may provide the required insurance coverage either through an existing policy or a new policy that I purchase independently.

- That if I fail to designate to my mortgage servicer where my escrowed insurance premiums are to be applied when required, that Seller will apply said funds to a Fire and Extended Policy obtained through Best for my benefit.

- That the required insurance policy must contain a clause making the proceeds of such insurance payable to Seller, or its assigns, to the extent of Seller's financial interest in my House.

- That Seller shall have the right, at its option, either to apply such insurance proceeds to the unpaid balance of the Contract or to permit such proceeds to be used to repair any damage to my House.

I further understand and acknowledge:

- That once Seller finishes building my House, it intends to assign my Contract and Security Instrument (together, referred to as "Account") to Mid-State Homes, Inc. ("MSH"), a company affiliated with Seller by common ownership; and that MSH will either retain or further assign my Account, but in any event will service my Account, which will include verifying that I have provided the insurance coverage required by the Contract and Security Instrument.

- That everything following the first paragraph in this Insurance Disclosure Statement which refers to Seller also applies to MSH and to any other assignee of the Contract.

- That the Contract and the Security Instrument further provide that, if I fail to deliver proof of the required insurance coverage at any time during the term of the Contract, **Seller has the right - but not the obligation - to purchase such insurance for its own protection <u>at</u> <u>my</u> <u>expense</u>**; this practice is commonly known as buying collateral protection insurance or "forceplacing" insurance.

- That Seller does not wish to forceplace insurance on my House; and that it is in my own best interest, for the reasons stated below, to obtain my own insurance on my House rather than have Seller forceplace insurance:

1) Seller's exercise of its right to forceplace insurance with respect to any particular policy year or succession or combination of policy years does not cure my default under the Contract and Security Instrument and shall not be deemed or considered a waiver by Seller of my continuing obligation to provide my own insurance coverage, and Seller shall not, by exercising its right on one or more occasions to forceplace coverage, thereafter become obligated to notify me of its future election not to forceplace insurance coverage on my House.

2) Seller presently buys its forceplaced insurance coverage through Best. I hereby authorize Seller, if I fail to provide evidence to Seller that I have obtained the required insurance coverage, to forceplace coverage through Best or any other agent or agency properly licensed to conduct business in my state.

3) The coverage Seller purchases from Best is limited to a Fire and Extended Coverage policy. If I want a Homeowner's policy, <u>I must purchase my own policy</u>.

4) If Seller forceplaces insurance on my House, the premium will be charged to me. The premium for Fire and Extended Coverage insurance will be within the range of premiums authorized by the Department of Insurance or the Insurance Commissioner of my state. <u>However, competing insurance agencies or companies operating in my state may offer similar coverage, or Homeowners coverage, at a lower cost.</u> If I want to obtain the most competitive price and/or the additional coverage offered by Homeowners insurance, I should look for and purchase such insurance myself.

5) If Seller forceplaces insurance on my House because I fail to provide evidence that I have purchased the required insurance, Seller, at its option, will order a policy from Best to provide the required coverage. Best will send me the policy and an invoice for payment of the premium. I am expected to pay Best directly. If I fail to pay Best, Seller will pay Best directly. If Seller pays Best, I am required by the Contract and Security Instrument to fully reimburse Seller immediately for the cost of such insurance. Until I have fully reimbursed Seller, the outstanding amount of the advance made by Seller to pay the premium to Best will accrue interest (if permitted by my state's law) at the rate disclosed in the Contract.

QS KS
Initials

6) The insurance coverage purchased by Seller will be solely to protect its own financial interest in my House. It will not be for my protection. Consequently, if Seller forceplaces insurance, Seller will only purchase insurance in an amount needed to pay off the unpaid balance of the Contract as of the date the insurance is purchased or such lesser amount as may be provided in the Contract. This amount will include the premium for such insurance. Most likely, if insurance is forceplaced and my House is later totally destroyed by an insurable event (such as fire), all of the insurance proceeds paid by the insurance company will be paid to Seller to satisfy my Account. I will receive little, if any, of the proceeds myself. I may lose, therefore, the equity in my House and the value of all of the contents in my House. I also may be liable for any personal injuries that may occur that would normally be covered by Homeowners insurance.

I hereby authorize Seller to use and disclose to insurance agents or companies, including Best, any and all information regarding the insurance requirements contained in my Contract and Security Instrument, the balance due under my Contract, and the value of my House and any other information reasonably necessary to obtain insurance coverage.

I hereby acknowledge reading, understanding and receiving on the date indicated below a copy of this Insurance Disclosure Statement. I acknowledge that Seller and its employees and agents have not advised me about the amount of insurance I should buy or required me to purchase insurance through any particular agent, broker or company. I further acknowledge that Seller has advised me to seek assistance about my insurance needs from a licensed insurance agent or other insurance advisor. I further understand and agree that the above requirements and procedures are consistent with the terms of the Contract and Security Instrument and that Seller and its assigns are under no obligation to purchase insurance coverage for my benefit. If I have any questions about this Insurance Disclosure Statement or any other matter relating to the Contract, I understand that I can telephone, toll-free, 1-800-925-8374 for assistance.

| | |
|---|---|
| 05/04/2007 [signature] | 05/04/2007 [signature] |
| Date Buyer-Signature | Date Buyer-Signature |
| QUINCY SHERMAN | KIZZY SHERMAN |
| PRINTED NAME | PRINTED NAME |

**Jim Walter HOMES**

# EXHIBIT "D"
# ARBITRATION AGREEMENT

The parties agree that any controversy (whether asserted as an original claim, counterclaim, cross claim or otherwise) arising out of or relating to this Agreement, or the breach thereof, or any negotiations leading up to the making of this Agreement, or any extensions of credit related to this Agreement, or the House that is the subject of this Agreement, or any insurance sold under or in connection with this Agreement, or any relationship resulting from any of the foregoing, whether asserted in tort, contract or warranty, or as a federal or state statutory claim, and whether arising before, during or after performance of this Agreement, shall be settled under this Arbitration Agreement in accordance with the procedures specified below. This Arbitration Agreement shall encompass and govern not only all controversies between Buyer and Seller, but also all controversies between Buyer and Seller and/or assigns, affiliates and present and former agents or employees of either Buyer or Seller.

The parties agree that as a condition precedent to either party instituting an arbitration proceeding and/or making a demand for arbitration pursuant to the procedures outlined herein, the party seeking arbitration will first notify the other, in writing, of the nature of the claim and/or dispute and then each party shall use their best efforts to resolve the dispute to each of their mutual satisfaction. If the parties cannot resolve the dispute by mutual agreement within fourteen (14) days of the written notice, then the parties agree to submit the dispute to non-binding mediation, the cost of which will be borne solely by Seller or its assign. The parties shall, in good faith, attempt to agree on the selection of a disinterested third party to act as mediator. In the event the parties cannot agree on the selection of a mediator, they agree to allow the Bar Association of the state in which this contract is entered into to select an individual from its approved panel of neutrals. If the Bar Association fails or refuses to select a mediator for the parties, they agree that the presiding judge of the state court of general jurisdiction sitting in the county in which the branch office of Seller that sold the House that is the subject of this Agreement is situated, may select the individual to serve as mediator.

In the event and only after the parties have been unable to resolve their disputes and/or claims through private negotiations and mediation, shall a party be entitled to institute an arbitration proceeding pursuant to the following procedures. The parties, as with the mediation process, shall, in good faith, attempt to agree on the selection of one individual to serve as the arbitrator. If the parties cannot agree on the selection of the arbitrator, then the arbitrator shall be selected in accordance with the rules of United States Arbitration and Mediation (USA&M) in effect as of June 30, 2003. Any arbitration hereunder shall be conducted pursuant to the rules of USA&M in effect as of June 30, 2003. Copies of rules may be obtained by contacting the Warranty/Customer Service Department, P.O. Box 31601, Tampa, Florida 33631-3601. USA&M is not a party to this Agreement and does not have the authority to alter, amend and/or change the procedures and/or rules set forth herein without the written consent of all parties hereto. To the extent USA&M changes and/or modifies its rules of June 30, 2003 and the parties to this Agreement do not provide their written consent to be bound by said changes and/or modifications and USA&M refuses to administer an arbitration hereunder, the parties to this Agreement agree that USA&M can be replaced with a substitute association to be selected by the presiding judge of the state court of general jurisdiction in the county in which the branch office of Seller that sold the House that is the subject of this Agreement is located. The parties to this Agreement acknowledge that the selection of USA&M and its rules and/or procedures is not an essential and/or material term of this Agreement and any issues relating thereto shall not be grounds to otherwise avoid and/or override the parties' expressed intent to arbitrate - rather than litigate - the disputes and/or claims covered by this Agreement.

Any dispute regarding whether a particular controversy is subject to arbitration, including, but not limited to claims contesting the making, existence, enforceability, scope or conscionability of this Arbitration Agreement, shall be decided by the arbitrator.

MAY 18 2007

Q.S. KS
Initials

**Jim Walter HOMES**

## EXHIBIT "D"

The parties agree that each party may take no more than two (2) depositions without the express written approval of the arbitrator. All controversies or claims will be decided on an individual (non-class) basis, and the claims of other parties will not be consolidated with or heard along with the claims of Buyer or Seller. Notwithstanding any rule to the contrary, to the extent permitted by applicable law, the arbitrator shall not have the power or authority to award any relief on a class-wide basis. The arbitrator shall award the relief, if any, that a court of competent jurisdiction could properly award under the facts and the applicable law (including punitive damages, attorney's fees and other costs, if allowed by applicable law or by Agreement). All defenses and privileges that would be available in a court proceeding will likewise be available in the arbitration. The provisions of this Arbitration Agreement to arbitrate disputes and any award of the arbitrator may be enforced by any court of competent jurisdiction. If either party refuses to arbitrate and the other party files suit to compel arbitration the party at whose request enforcement is ordered will be entitled to an award of all costs, fees and expenses, including a reasonable attorney's fee incurred in compelling arbitration, to be paid by the party against whom enforcement is ordered. The arbitration shall be conducted in the office of the arbitrator or such other location as may be agreed upon by the parties or designated by the arbitrator. The cost of the arbitration will be divided equally among the parties to the arbitration. Except as otherwise provided in this Arbitration Agreement or by the arbitration rules selected herein, the parties will bear their own expenses and attorney's fees. Upon Buyer's written request demonstrating financial hardship or upon a finding by the arbitrator that there is financial hardship, Seller may, solely in its discretion, pay or advance all or part of the cost of the arbitration. The parties agree that this provision in no way imposes any duty upon the Seller to determine the financial ability of the Buyer.

Buyer acknowledges that Seller is a Florida corporation with its principal place of business in the State of Florida. The parties acknowledge and contemplate at the time of the execution of this Agreement that some or all of its materials, fixtures and equipment, as well as the source of financing contemplated by this Agreement, will be purchased, received or have their origin from sources outside the state where the House is to be constructed. The parties contemplate that through the performance of this Agreement substantial interstate activity will occur and is affected thereby.

Notwithstanding the foregoing, should a combined controversy otherwise subject to the terms of this Arbitration Agreement seek relief in an aggregate amount not exceeding $1500.00, the parties shall retain the election to seek relief from a court of competent jurisdiction. The intent of this election is to limit arbitration to claims that could not reasonably and legitimately be characterized as "small claims" defined as claims involving in the aggregate less than $1500.00 in controversy. Further, notwithstanding the foregoing, Seller and its assigns retain the option to use judicial or non-judicial relief to seek such remedies as (i) foreclosure and ejectment granted to Seller or its successors and assigns in the mortgage or under applicable law, (ii) suits to establish or quiet title to any property covered by the mortgage, and (iii) suits to establish or enforce equitable liens. The institution and maintenance of an action for judicial relief in accordance with the preceding sentence shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this Agreement, including any counterclaim filed in a suit brought by Seller, or its assigns, pursuant to this provision.

This Agreement to arbitrate disputes will survive payment in full of any promissory note or other debt and satisfaction of mortgage or other security lien. The terms of this Agreement control over any inconsistent rules and/or procedures of USA&M currently in effect or hereinafter adopted.

QS ES
Initials

Jim Walter HOMES

**EXHIBIT "D"**

**NOTICE: Seller and Buyer hereby knowingly and voluntarily waive the right to trial by jury of any controversy between them that is covered by this Arbitration Agreement. Buyer acknowledges that he/she/they are waiving their right to a trial by jury that may otherwise exist by executing this Agreement.**

**By signing the space below, you are agreeing to have all controversies described in this Arbitration Agreement decided by binding arbitration, and you are giving up any rights you might possess to have those matters litigated by a jury trial or in a court, except to the extent specifically provided for under this Agreement. By signing in the space below you are giving up your judicial rights to discovery and appeal except to the extent that they are specifically provided for under this Agreement. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under federal or state law. By signing in the space below, you are acknowledging that your agreement to this arbitration provision is voluntary and freely given.**

**To the extent any provision of this Agreement is declared to be unenforceable, such provision(s) is to be severed from the other provisions hereto and said remaining provisions shall remain in full force and effect.**

I/We have read and understand that foregoing, waive our right to a jury trial, and agree to submission of all controversies to binding arbitration in accordance with this Arbitration Agreement.

Seller:

Jim Walter Homes, Inc.

BY: *Kate Cipolla*
Signature

Date: 05/04/2007

Buyer:

*[signature]*
Signature

QUINCY SHERMAN
Printed Name

05/04/2007
Date

*[signature]*
Signature

KIZZY SHERMAN
Printed Name

05/04/2007
Date

# JIM WALTER HOMES, INC.

Branch Jim Walter - Columbus

## RECEIPT

I/we hereby acknowledge receipt of a copy of the Construction Agreement; Financing Agreement; promissory note (not applicable in TX); the mortgage, deed of trust, deed to secure debt or mechanic's lien contract; Exhibit "A" entitled Package, Option and Additions; Exhibit "B" entitled Specifications and Data Rider; Exhibit "C" entitled New Construction Insurance Disclosure; Exhibit "D" entitled Arbitration Agreement; Notice of Cancellation; Limited Warranty (not applicable IN, LA, MD); the building plans of the house to be constructed by Jim Walter Homes, Inc.; *Your Jim Walter Home: An Information Manual for the New Homeowner*, and *Our Policy Regarding Your Privacy*.

I/we certify that all these documents were in complete form at the time I/we signed them.

I/we certify that no representations or guarantees other than set forth in the above described documents have been made. I/we understand that any changes in design, specifications, or materials to be furnished must appear in the contract; that any changes or modifications thereto must be in writing and signed by the parties; and that the Limited Warranty cannot be changed or altered in any way.

I/we certify that prior to entering into this contract I/we have not received as an inducement to entering into said contract any promise of any rebate, discount, commission or other valuable consideration for referral of sales to Jim Walter Homes, Inc.

Dated this 04 day of May, 20 07.

Buyer QUINCY SHERMAN

Witness

Buyer KIZZY SHERMAN

MAY 18 2007

**THIS WARRANTY CANNOT BE CHANGED OR ALTERED IN ANY WAY REGARDLESS OF ANY REPRESENTATION OR STATEMENT TO THE CONTRARY. NEITHER BUYER NOR BUILDER'S AGENT OR REPRESENTATIVE HAS THE AUTHORITY TO CHANGE, ALTER, OR MODIFY ANY OF THE TERMS OR PROVISIONS OF THIS WARRANTY.**

BUYER HEREBY ACKNOWLEDGES AND CONFIRMS TO BUILDER (1) THAT THE FOREGOING WARRANTY (WHICH INCLUDES THE "AGREED STANDARDS") IS THE ONLY WARRANTY MADE OR GIVEN BY BUILDER CONCERNING OR APPLICABLE TO THE HOUSE TO BE BUILT BY BUILDER; (2) THAT NO ONE HAS MADE OR GIVEN TO BUYER ANY STATEMENTS OR REPRESENTATIONS THAT ARE IN ANY WAY CONTRARY TO THE TERMS AND PROVISIONS OF THE WARRANTY; (3) THAT BUYER HAS READ AND UNDERSTANDS THE WARRANTY; (4) THAT NO ONE HAS THE AUTHORITY TO VARY OR CONTRADICT ANY OF THE TERMS OR PROVISIONS OF THE WARRANTY; (5) THAT BEFORE ENTERING INTO THE CONTRACT WITH BUILDER, BUILDER HAS REQUESTED THAT BUYER FULLY EXAMINE THE MODELS AND BUYER HAS EXAMINED THE MODELS AT BUILDER'S NEW HOME GALLERY AS FULLY AS BUYER DESIRED OR BUYER HAS KNOWINGLY ELECTED NOT TO EXAMINE SAID MODELS; (6) THAT THE QUALITY AND PERFORMANCE OF THE HOUSE AND ITS CONSTRUCTION SHALL BE PURSUANT TO THE AGREED STANDARDS CONTAINED IN THIS WARRANTY.

The following acknowledgment to be completed in **ILLINOIS** and **MISSOURI** only:

BUILDER HEREBY EXPRESSLY DISCLAIMS THE IMPLIED WARRANTY OF HABITABILITY CREATED BY CASE LAW IN THE STATE IN WHICH THE HOUSE WILL BE BUILT, AND ANY OTHER STATUTORY IMPLIED WARRANTY OF HABITABILITY. THE CONSEQUENCE OF SUCH DISCLAIMER BY BUILDER IS THAT, EXCEPT AS EXPLICITLY STATED IN THIS LIMITED WARRANTY DOCUMENT, BUILDER WILL NOT BE LIABLE IF THE HOUSE IS NOT OF REASONABLE STRUCTURAL QUALITY AND IS NOT REASONABLY FIT FOR USE AS A RESIDENCE. BUILDER'S SOLE AND EXCLUSIVE WARRANTY GIVEN TO BUYER IN CONNECTION WITH THIS AGREEMENT IS THE LIMITED WARRANTY EXPRESSLY SET FORTH HEREIN. BUYER'S INITIALS ADJACENT TO THIS PARAGRAPH ARE INTENDED AS AND SHALL BE EVIDENCE OF (1) BUYER'S ACKNOWLEDGMENT OF BUILDER'S DISCLAIMER OF SUCH IMPLIED WARRANTY OF HABITABILITY AND OF BUYER'S ACCEPTANCE OF THE LIMITED WARRANTY SET FORTH HEREIN AS THE SOLE AND EXCLUSIVE WARRANTY OFFERED BY BUILDER IN CONNECTION WITH THE SALE OF THE HOUSE, AND (2) BUYER'S KNOWING RELINQUISHMENT OF THE PROTECTION OF THE IMPLIED WARRANTY OF HABITABILITY AND ALL OTHER IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, SUITABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

________ (Buyer's Initials)

________ (Buyer's Initials)

I hereby acknowledge that I received Jim Walter Homes, Inc. and Neatherlin Homes, Inc., Limited Warranty Booklet and have read and understand the above statements concerning my warranty on this 4th day of May, 2007.

[signature]
Buyer

MAY 18 2007

[signature]
Buyer

HBG 1205 (REV. 6/05)

# MISSISSIPPI
# NEW HOME WARRANTY ACT

**§ 83-58-1. Short title.**
This chapter shall be known and may be cited as the "New Home Warranty Act."

**§ 83-58-3. Definitions.**
For purposes of this chapter the following words and phrases shall have the meanings ascribed herein unless the context clearly indicates otherwise:

(a) "Builder" means any person, corporation, partnership, or other entity which constructs a home or engages another to construct a home, including a home occupied initially by its builder as his residence, for the purpose of sale.

(b) "Building standards" means the standards contained in the building code, mechanical-plumbing code, and electrical code in effect in the county, municipality, or other local political subdivision where a home is to be located, at the time construction of that home is commenced, or, if the county, city, or other local political subdivision has not adopted such codes, the Standard Building Code, together with any additional performance standards, if any, which the builder may undertake to be in compliance.

(c) "Home" means any new structure designed and used only for residential use.

(d) "Initial purchaser" means any person for whom a home is built or the first person to whom a home is sold upon completion of construction.

(e) "Major structural defect" means any actual physical damage to the following designated load-bearing portions of a home caused by failure of the load-bearing portions which affects their load-bearing functions, as follows to wit:

(i) Foundation systems and footings; (ii) Beams; (iii) Girders; (iv) Lintels; (v) Columns; (vi) Walls and partitions; (vii) Floor systems; (viii) Roof framing systems.

(f) "Owner" means the initial purchaser of a home and any of his successors in title to a home during the time the warranties provided under this chapter are in effect.

(g) "Warranty commencement date" means the date that legal title to a home is conveyed to its initial purchaser or the date the home is first occupied, whichever occurs first.

**§ 83-58-5. Builder's warranties to owner.**
(1) Subject to the exclusions provided in this section, every builder warrants the following to the owner:

(a) One (1) year following the warranty commencement date, the home will be free from any defect due to noncompliance with the building standards.

(b)Six (6) years following the warranty commencement date, the home will be free from major structural defects due to noncompliance with the building standards.

(2) Unless the parties otherwise agree in writing, the builder's warranty shall exclude the following items: Defects in outbuildings including detached garages and detached carports, except outbuildings which contain the plumbing, electrical, heating, cooling or ventilation systems serving the home; swimming pools and other recreational facilities; driveways; walkways; patios; boundary walls; retaining walls; bulkheads; fences; landscaping, including sodding, seeding, shrubs, trees, and planting; off-site improvements including streets, roads, drainage and utilities or any other improvements not a part of the home itself.

(a) Damage to real property which is not part of the home covered by the warranty and which is not included in the purchase price of the home.

MAY 18 2007

QS KS
Initials

(b) Any damage to the extent it is caused or made worse by any of the following:

(i) Negligence, improper maintenance or improper operation by anyone other than the builder or any employee, agent or subcontractor of the builder.

(ii) Failure by anyone other than the builder or any employee, agent or subcontractor of the builder to comply with the warranty requirements of manufacturers of appliances, equipment or fixtures.

(iii) Any change, alteration or addition made to the home by anyone after the initial occupancy by the owner, except any change, alteration or addition performed by the builder, or any employee, agent, or subcontractor of the builder.

(iv) Dampness, condensation or other damage due to the failure of the owner to maintain adequate ventilation or drainage.

(d) Any loss or damage which the owner has not taken timely action to minimize.

(e) Any defect in, or any defect caused by, materials or work supplied by anyone other than the builder, or any employee, agent or subcontractor of the builder.

(f) Normal wear and tear or normal deterioration.

(g) Loss or damage which does not constitute a defect in the construction of the home by the builder, or any employee, agent or subcontractor of the builder.

(h) Loss or damage resulting from war, accident, riot and civil commotion, water escape, falling objects, aircraft, vehicles, acts of God, lightning, windstorm, hail, flood, mud slide, earthquake, volcanic eruption, wind driven water and changes in the level of the underground water table which are not reasonably foreseeable.

(i) Insect damage and rotting of any kind.

(j) Mold or mold damage, except in cases where the builder's negligence was a proximate or contributing cause of the mold or mold damage.

(k) Any condition which does not result in actual physical damage to the home.

(l) Failure of the builder to complete construction of the home.

(m) Any defect not reported in writing by registered or certified mail to the builder or insurance company, as appropriate, prior to the expiration of the period of coverage of that defect plus thirty (30) days.

(n) Consequential damages.

(o) Any loss or damage to a home caused by soil conditions or soil movement if the home is constructed on land owned by the initial purchaser and the builder obtains a written waiver from the initial purchaser for any loss or damage caused by soil conditions or soil movement.

(p) Any defect in an electrical, plumbing, heating, air conditioning or similar fixture not manufactured by the builder for which the manufacturer provides a warranty regardless of duration.

(3) The provisions of this section establish minimum required warranties and shall not be waived by the owner or reduced by the builder, provided the home is a single family dwelling to be occupied by an owner as his home.

**§ 83-58-7. Written notice of defect to builder.**

Before undertaking any repair himself, except repair to minimize loss or damage as provided in Section 83-58-5(2)(d), or instituting any action under Section 83-58-17, the owner shall give the builder written notice within ninety (90) days after knowledge of the defect by registered or certified mail, advising him of the defects and giving the builder a reasonable opportunity to repair the defect. The builder shall give the owner written notice of the requirements of this chapter at the time of closing. If the builder does not provide such notice, the warranties provided in this chapter shall be extended for a period of time equal to the time between the warranty commencement date and date notice was given.

QS KC
Initials

**§ 83-58-9. Commencement of warranty action.**
Any action to enforce any warranty provided in this chapter shall commence thirty (30) days after the expiration of the appropriate time period provided.

**§ 83-58-11. Insurance for warranty allegations.**
All or part of the builder's obligation under any warranty required in this chapter may be insured by the builder for the benefit of the purchaser through an insurance company authorized to transact business in this state.

**§ 83-58-13. Transfer of warranties.**
Any warranty imposed under the provisions of this chapter and any insurance benefit shall automatically transfer, without charge, to a subsequent owner who acquires title to a home. Any transfer of the home shall not extend the duration of any warranty or insurance coverage.

**§ 83-58-15. Damages; arbitration of claims.**
The damages with respect to a single defect shall not exceed the reasonable cost of repair or replacement necessary to cure the defect, and damages with respect to all defects in the home shall not exceed the original purchase price of the home.
The parties may provide for the arbitration of any claim in dispute. Any arbitration may be binding only to the extent provided by law.

**§ 83-58-17. Common law remedies.**
(1) If a builder violates any of the provisions of this chapter by failing to perform as required by the warranties provided in this chapter, any affected owner shall have a cause of action against the builder for actual damages, including attorney fees and court cost, arising out of the violations.
(2) Nothing in this chapter shall prevent the owner from filing a cause of action based on breach of contract and remedies attendant to such cause of action.
(3) If the owner files a civil action without first complying with the provisions of this chapter, the court shall dismiss the action without prejudice, and the action may not be refiled until the claimant has complied with the notice requirements of this chapter.

RECEIPT ACKNOWLEDGEMENT

I (we) hereby acknowledge that I (we) have received a copy of this New Home Warranty Act.

Dated: 5-4-07

[signature] 5-4-07
Buyer

[signature] 5-4-07
Buyer

**NOTICE OF CANCELLATION***

**I hereby acknowledge receipt of this form.**

Jim Walter - Columbus
**(Branch Office)**

SHERMAN & SHERMAN
**(Print Buyer(s) Last Name(s))**

Q.S KS
**(Buyer's Initials)**

05/04/2007
**(enter date of transaction)**

**You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.**

**If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within TEN BUSINESS DAYS following receipt by the Seller of your cancellation notice, and any security interest arising out of the transaction will be canceled.**

**If you cancel, you must make available to the Seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the Seller regarding the return shipment of the goods at the Seller's expense and risk.**

**If you do make the goods available to the Seller and the Seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the Seller, or if you agree to return the goods to the Seller and fail to do so, then you remain liable for performance of all obligations under the contract.**

**To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice, or send a telegram, to Jim Walter Homes, Inc. at 4211 W. Boy Scout Blvd., Tampa, Florida 33607, Attn: CRD Department, NOT LATER THAN MIDNIGHT OF** TUESDAY 5/8/07.
**(Date)**

**I HEREBY CANCEL THIS TRANSACTION.**

______________________________
**(Date)**

______________________________
**(Buyer's Signature)**

______________________________
**(Buyer's Signature)**

***This form for use in AL, AR, FL, GA, IL, IN, KS, KY, LA, MD, MO, MS, NC, OH, OK, SC, TN, TX, WV.**

MISSISSIPPI
ASSIGNMENT OF DEED OF TRUST

THIS ASSIGNMENT OF DEED OF TRUST dated effective April 17, 2009, from Walter Mortgage Company LLC having an address of P.O. Box 31601, Tampa, Florida 33631-3601 ("Assignor or Grantor") to Walter Investment Management Corp., a Maryland corporation having an address of P.O. Box 31601, Tampa, Florida 33631-3601, ("Assignee").

WITNESSETH:

FOR VALUE RECEIVED, Assignor does hereby sell, assign, transfer and set over unto Assignee, its successors and assigns, and does mortgage and grant a security interest in those certain mortgages contained on "Exhibit A" attached hereto, together with the debts thereby secured, the notes therein described, and all interest and lien of the Assignor in and to the lands and property conveyed by said mortgages without recourse; said mortgages appear of record in the Records of Oktibbeha County, Mississippi.

IN WITNESS WHEREOF, the Grantor Walter Mortgage Company LLC has caused its own name to be signed this 17th day of April, 2009.

WALTER MORTGAGE COMPANY LLC

By: C.T.W.
Name: C.T. Witherington
Title: Senior Vice President

ACKNOWLEDGMENT

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

PERSONALLY appeared before me, the undersigned authority in and for the jurisdiction aforesaid and within said jurisdiction, the within named C.T. Witherington, who by me being first duly sworn stated on oath that he is Senior Vice President of Walter Mortgage Company LLC and, that, having been first duly authorized so to do, signed and delivered the foregoing instrument in their corporate capacity for and on behalf of Walter Mortgage Company LLC the Grantor named in said instrument, as the act and deed of said Grantor and with full authority to so act.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE this the 17th day of April, 2009.

NOTARY PUBLIC
Print Name: Sally Leon
My Commission Expires: 9/19/2012

NOTARY PUBLIC STATE OF FLORIDA
SALLY LEON
MY COMMISSION # [redacted]
EXPIRES: September 19, 2012
1-800-3-NOTARY Fl. Notary Discount Assoc. Co.

THIS INSTRUMENT PREPARED BY:
Jeffrey P. Thofner, Attorney at Law
P. O. Box 31601
Tampa, FL 33631-3601

AFTER RECORDING RETURN TO:
Walter Mortgage Company
P. O. Box 31601
Tampa, FL 33631-3601
Attn: Sally Leon
(813) 871-4652

7/1/2009

# EXHIBIT A

The deeds of trust described in the foregoing assignment are described more particularly in the following list which sets forth the names of the grantors of the deeds of trust, the original principal balance of the promissory note secured thereby, and the book and page number of the registry of deeds of the county and state listed below, where the deeds of trust are recorded.

State of : **MS**

County of : **Oktibbeha**

| ACCOUNT | GRANTOR(S) | DEED OF TRUST | PAGE | ORIG BALANCE |
|---|---|---|---|---|
| 2010182300 | WILSON TAMMY<br><br>NE1/4 SW1/4 S26 T17N R15E | 2006 | 19921 | 192,265.20 |
| 2010752200 | TATE WILLIE G.<br>TATE REKEKA<br><br>SE1/4 SW1/4 S31 T19 R15E | 2007 | 909 | 189,957.60 |
| 2011164000 | SHERMAN QUINCY<br>SHERMAN KIZZY<br><br>NW1/4 SW1/4 S21 T19N R15E | 2007 | 12050 | 191,790.00 |
| 2011170400 | WILLIAMS CATINA<br><br>NE1/4 SW1/4 S12 T19N R15E | 2007 | 10035 | 218,530.80 |

2009 12406
Recorded in the Above
Mortgage Book & Page
07-20-2009 02:51:41 PM

7/1/2009

# EXHIBIT A

The deeds of trust described in the foregoing assignment are described more particularly in the following list which sets forth the names of the grantors of the deeds of trust, the original principal balance of the promissory note secured thereby, and the book and page number of the registry of deeds of the county and state listed below, where the deeds of trust are recorded.

State of : **MS**

County of : **Oktibbeha**

| ACCOUNT | GRANTOR(S) | DEED OF TRUST | PAGE | ORIG BALANCE |
|---|---|---|---|---|
| 2011398400 | BELL JR. ROGERS L.<br>BELL LAVOUN D<br><br>NW1/4 S9 T18N R15E | 2007 | 9605 | 317,210.40 |
| 2011763000 | SHANKLIN BANKHEAD<br>SHANKLIN TRACY<br><br>S10 T17N R12E | 2007 | 16621 | 323,978.40 |
| 2012230500 | BEVILL PEGGY<br><br>LOT C HARLEM SUBDIVISION | 2007 | 8130 | 244,594.80 |
| 2012348000 | JACKSON GRACE<br><br>S3 T19N R13E | 2007 | 13735 | 433,126.80 |

2009 12407
Recorded in the Above
Mortgage Book & Page
07-20-2009 03:51:41 PM

7/1/2009

# EXHIBIT A

The deeds of trust described in the foregoing assignment are described more particularly in the following list which sets forth the names of the grantors of the deeds of trust, the original principal balance of the promissory note secured thereby, and the book and page number of the registry of deeds of the county and state listed below, where the deeds of trust are recorded.

State of : **MS**

County of : **Oktibbeha**

| ACCOUNT | GRANTOR(S) | DEED OF TRUST | PAGE | ORIG BALANCE |
|---|---|---|---|---|
| 2012580800 | SNELL JR CURTIS G<br>SNELL JEFFERSON MARIA<br><br>S4 T19N R15E | 2008 | 4020 | 268,534.80 |
| 2012830900 | NORWOOD MARY<br><br>S27 T19N R14E | 2008 | 6941 | 141,606.00 |

2009 12408
Recorded in the Above
Mortgage Book & Page
07-20-2009 02:51:41 PM
Monica W. Banks
Oktibbeha County, MS

CHANCERY COURT OKTIBBEHA
MISSISSIPPI

Oktibbeha County, MS
I certify this instrument was filed on
07-20-2009 02:51:41 PM
and recorded in Mortgage Book
2009 at pages 12404 - 12408
Monica W. Banks